**Grant COOPER, Plaintiff,**

v.

**G. Robert ROSS, C. Fred Williams, Fred Pickens, Richard Arnold, Hugh Chalmers, Preston Hathcock, Charles Kemp, Raymond Miller, Louis Ramsay, Roy Ritter, George Shankle, and Robert Shults, Defendants.**

No. LR–74–C–347.

United States District Court, E. D. Arkansas, W. D.

June 25, 1979.

Phillip E. Kaplan, John M. Bilheimer, Kaplan, Brewer, Bilheimer & Marks, P. A., Little Rock, Ark., for plaintiff.

Robert S. Lindsey, Patrick J. Goss, Wright, Lindsey & Jennings, Little Rock, Ark., Ray Trammell, Fayetteville, Ark., for defendants.

HEANEY, Circuit Judge, Sitting by Designation.

On November 11, 1974, in the United States District Court for the Eastern District of Arkansas, Grant Cooper filed this action, alleging that he was not reappointed to the faculty of the University of Arkansas at Little Rock in violation of his rights of freedom of speech and association guaranteed by the First and Fourteenth Amendments of the Constitution and by 42 U.S.C. § 1983 (1976). Jurisdiction is premised upon 28 U.S.C. § 1343(3) (1976). The cause was tried to the Court in October 1978. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact.

## FINDINGS OF FACT

1. In September 1969, Little Rock University was merged into the University of Arkansas, an educational institution of the State of Arkansas. Defendant G. Robert Ross was appointed Chancellor of the University of Arkansas at Little Rock (UALR or University) in January 1973. Defendant C. Fred Williams was named head of the History Department at the University in May 1973. The remaining defendants are all members of the University of Arkansas Board of Trustees.[1] All defendants are sued only in their official capacities.

2. Grant Cooper was employed as an assistant professor of history at the University for the 1970–71 academic year. He was reappointed as assistant professor for the 1971–72, 1972–73 and 1973–74 academic years.

3. Cooper did not have tenure. The Faculty Handbook provided that:

> A non-tenure appointment may be terminated effective at the end of an academic or fiscal year as the case may be at the option either of the individual or the University.

4. During the fourth year of teaching at the rank of assistant professor, a faculty member was normally considered for promotion to associate professor. Promotion would automatically confer tenure. Alternatively, the teacher could be retained at the rank of assistant professor without tenure, or he could be notified that he would not be reappointed. The Faculty Handbook provided that one who had been a faculty member for two or more years was entitled to at least one year's written advance notice if he was not going to be recommended for reappointment.

5. Prior to the spring of 1973 there were no established procedures and no specific standards for faculty evaluation and promo-

---

1. For convenience, the defendants are sometimes collectively referred to as the University.

tion purposes, either University-wide or within the History Department. Beginning in the spring of 1973 the Ross administration instituted a policy of merit pay increases and required periodic faculty evaluations.

6. Cooper became a member of the Progressive Labor Party (PLP) in June or July 1973. In mid-July 1973, at the beginning of the second summer school session, Cooper informed his classes in World Civilization and American Civilization that he was a communist and a member of the PLP, and that he taught his courses from a Marxist point of view. Other History Department members and Chancellor Ross learned of the statements shortly thereafter.

7. At registration for the fall 1973 term, Williams questioned Cooper about his statements to his classes and suggested to Cooper that it was inappropriate for him to announce his personal point of view to his classes. Bedford Hadley, Dean of the Division of Social Science, similarly discussed the matter with Cooper. Cooper was, however, not directed to discontinue the practice.

8. On September 20, 1973, *Essence*, an "underground" student newspaper, carried an article about Cooper and his statements to his summer school classes. On September 26, 1973, substantially the same article appeared on the front page of the *Arkansas Gazette*, a newspaper with statewide circulation. The articles apparently reported that Cooper had been ordered by the University not to state his personal political views in the classroom. Thereafter, Cooper became the subject of considerable public controversy and for several weeks the case received daily newspaper and television coverage.

9. On October 8, 1973, twenty-three state legislators, as individuals, filed suit in state court against Cooper, Chancellor Ross, and the Trustees of the University, to enjoin Cooper's further employment at the University. The suit was predicated on Ark.Stat.Ann. §§ 41–4111 and 41–4113 (1964). Section 41–4113(c) provided,

No person who is a member of a Nazi, Fascist or Communist society, or any organization affiliated with such societies, shall be eligible for employment by the State of Arkansas, or by any department, agency, institution, or municipality thereof.

10. On approximately October 2, October 9, and October 23, 1973, Cooper participated in public forums sponsored by Students for Action and the PLP regarding the use by another UALR faculty member of *The Unheavenly City* by Edward Banfield as a required textbook. Cooper publicly criticized the book as racist and unscientific and argued that the book should not be required course material and should be banned from the University campus.

11. On October 3, 1973, Cooper met with Chancellor Ross at the latter's request. They discussed the statements Cooper made to his classes, Cooper's political beliefs and how these affected his teaching of his courses. They also discussed Cooper's statements about the Banfield book.

A second meeting was held on October 29, 1973, and the same general issues were discussed. At the conclusion of the discussion Ross inquired whether, if instructed by the University, Cooper would teach his courses from an objective point of view and refrain from identifying his own beliefs to his classes. Cooper responded that he felt it would be intellectually dishonest if he did not state his own beliefs, that he could not be entirely objective toward other points of view, and that if he were ordered not to teach from a Marxist point of view he would feel compelled to resist the order. At no time in either meeting were any other factors relating to Cooper's performance as a teacher discussed.

12. On November 7, 1973, Cooper was notified by Williams that he was not recommending Cooper's reappointment and that Cooper's 1974–75 appointment would be a terminal appointment.

13. Cooper requested and was granted a conference at which Williams explained his decision not to recommend Cooper's further employment. Cooper then requested and received a written list of reasons for the

non-reappointment recommendation. The reasons given were as follows:

1. A student evaluation of faculty, published by the Student Government Association during the 1971/72 academic year, gave your courses in History of Civilization next to the lowest evaluation of any faculty member in the department. A student survey in the fall semester of 1973, conducted by a student, reflected a concern for your academic competence.

2. An evaluation by the acting department chairman, dated April 30, 1973, gave you the lowest merit rating of any of the full time departmental faculty with terminal degrees.

3. Over a period of some three years, a variety of irregularities have been brought to your attention. These include:

   a. Questionable grading procedures and problems involving evaluation of students.

   b. Student complaints about meeting and conducting scheduled classes.

4. The Dean of the Division of Social Science, who was a former chairman of the History Department, has stated that during the past three years he has received more student complaints about your teaching responsibilities than has been received on any other faculty member in the division.

5. Students have repeatedly indicated that your courses did not cover the subject area as described in the University catalog; that you failed to adhere to the required text materials in assignments, lectures or discussion and your attitude toward those materials discouraged their use.

6. Changing, in a unilaterial [sic] manner, the content and scope of a course required by the general faculty for graduation.

7. Your attempts to restrict the academic freedom of others in the academic community which reflects a lack of restraint and does not show proper respect for the opinion of others in the academic setting. Specifically, your statements about banning a book on the UALR campus.

8. You have indicated either a lack of awareness or concern for a well known and respected statement of the American Association of University Professors in a "1940 Statement of Principles and Interpretive Comments" on academic freedom and tenure. Paragraph "C" of that document, in reference to the college or university teacher, includes the following statements:

> "As a man of learning and an educational officer, he (the teacher) should remember that the public may judge his profession and his institution by his utterances."

9. These reasons have led me to conclude that your professional development in scholarly endeavors and classroom instruction have not been satisfactorily demonstrated and, therefore, your appointment as assistant professor should not be renewed. I feel confident that a more qualified person can be readily employed as an assistant professor.

14. Reason 1 was subsequently withdrawn by Williams after Cooper objected that the student surveys were unscientific and unvalidated and that University officials had previously indicated that the surveys would not be considered in faculty appointment decisions.

Reason 2 referred to an evaluation of Cooper by T. Harri Baker, the former head of the History Department, prepared in the spring of 1973 for the purpose of granting merit pay increases. Cooper received ratings of average or superior in every category evaluated and the comments indicated he had shown improvement in his teaching. Cooper was awarded a six percent pay increase whereas the average increase for members of the History Department was slightly above seven percent. Cooper was not advised at the time that his was the "lowest merit rating" although he was aware that some other members of the department received higher raises than he did.

Reason 3 referred to several different factors including, *inter alia,* complaints by some students that Cooper graded too hard, fluctuations in Cooper's grades from the lowest in the department to the second highest, and permitting too many students to take "incomplete" grades in his courses. Cooper corrected the last problem after it was brought to his attention.

Reasons 3a, 3b, 4 and 5 referred to a variety of student complaints. No records were available of the persons who made the complaints, the dates, or nature and number of the complaints. At the time they were received, little effort was made to verify or investigate the complaints. Although on occasion faculty members had casually mentioned student complaints to Cooper, they had indicated that the complaints were not considered to be serious.

Reason 6 referred, in part, to a handout Cooper used in his World Civilization course in the fall semester of 1973. This handout stated the proposition: "The history of all hitherto existing society is the history of class struggles." The handout attributed the statement to Marx and Engels and indicated Cooper's agreement with it. Students were assigned to write a term paper on a subject of their choosing to test the proposition.

Reason 7 referred to Cooper's public comments about the Banfield book.

With the exception of reasons 6, 7 and 8, which were discussed to some extent in the conferences with Chancellor Ross, Cooper had never previously been informed that his teaching performance was unsatisfactory in these or any other respects.

15. Cooper requested reconsideration of the decision. By letter dated January 21, 1974, Williams informed Cooper that he had reevaluated him without considering the student surveys, but would not change his recommendation.

16. Cooper requested that his case be reviewed by the Senate Standing Committee on Academic Tenure, as provided in the UALR Faculty Handbook. There was, however, at that time no such committee in existence. Therefore, the UALR faculty assembly created an ad hoc committee to review Williams's recommendation not to reappoint Cooper. In May 1974 the committee conducted hearings at which Cooper and his attorneys were present and were allowed to question the University witnesses. Cooper was not permitted to present witnesses. Because this was the first such review in the history of UALR, there was considerable confusion regarding the purpose and function of the committee. The committee initially agreed that its purpose was not to consider the merits of the decision, but only to consider its procedural adequacy, *i.e.,* whether the procedural requirements set out in the handbook regarding notice and hearings in non-reappointment cases had been complied with. In fact, however, there was some discussion of the reasons for the non-reappointment decision.

In a cryptic report the committee concluded that the decision not to recommend Cooper's reappointment was "the result of adequate consideration in terms of the relevant standards of the institution." [2] However, the committee also reported that many of its members expressed "deep concern" about "the ambiguities in the eight stated reasons for non-reappointment, the quality of the evidence and documentation submitted by the History department, the timing of the non-reappointment announcement, and the generally unprofessional administration of this matter."

17. Cooper then requested and was granted interviews with Hadley and with James Fribourgh, Vice-Chancellor for Academic Affairs. By letter dated July 9, 1974, Hadley and Fribourgh informed Cooper

---

**2.** This language is taken directly from the Faculty Handbook which provides that the function of the Standing Committee on Tenure is "[t]o determine whether the decision of the faculty body or individual recommending non-reappointment was the result of adequate consideration in terms of the relevant standards of the institution, with the understanding that the Tenure Committee should not substitute its judgment for that of the faculty body or individual."

that they concurred in the recommendation that he not be reappointed.

18. Prior to Cooper, no full-time faculty member had ever been non-reappointed or dismissed from UALR from the time it became a part of the state university system in 1969.

19. In the interim, the state lawsuit was tried in Pulaski County Chancery Court. The University joined with Cooper in contesting the suit on the ground that the Arkansas statutes were unconstitutional. On March 28, 1974, the court entered a decree upholding the statutes and enjoining further payment of Cooper's salary.

20. The University allowed Cooper to finish the spring term of 1974, but did not allow him to teach during the 1974–75 academic year, which was to have been his terminal appointment year, despite his offer to do so without pay.

21. Cooper and the University appealed the decision of the Chancery Court to the Arkansas Supreme Court and on April 7, 1975, the court declared Ark.Stat.Ann. § 41–4113(c) unconstitutional.

22. The fact that Cooper was a communist and a member of the PLP and publicly stated both in and out of the classroom that he was a communist and a member of the PLP were substantial or motivating factors in the decision not to renew his appointment.

23. Other factors also played some part in the decision not to renew Cooper's appointment, including evaluations of his teaching performance by the department chairman and other members of the History Department faculty, and the manner in which he expressed his criticism of the Banfield book.

24. However, the same non-reappointment decision would not have been made had it not been for the fact that Cooper was a communist and a member of the PLP and publicly acknowledged these facts. The factors relied on by the University, considered individually or collectively, would not alone have caused the nonrenewal of Cooper's contract.

25. The University, through the History Department, prescribed the general subject matter for each course in the department. For the World Civilization course, which was divided into multiple sections taught by different teachers, there was general agreement among the department faculty on the text to be used in the course and on the periods of history to be covered each semester. Beyond this, each instructor had considerable latitude in organizing and presenting the material. Specifically, there were no department standards or policies requiring that this course, or any other course, be taught from an objective or any other specific point of view. Different faculty members taught their courses from different points of view.

26. Cooper substantially covered the subject matter of his courses. The record does not support the University's position that the fact Cooper professed to teach his courses from the Marxist point of view necessarily limited his coverage of the prescribed subject matter. Similarly, the handout distributed to Cooper's World Civilization course in the fall term of 1973 is not alone sufficient to establish that the course deviated in content and scope from the prescribed curriculum. There is simply no evidence of what in fact was covered in his courses other than Cooper's testimony that he covered the prescribed course material.

27. Cooper did not use his classes to proselytize students for membership in the PLP. In fact, he encouraged students to challenge and dispute his views.

28. Although Cooper would have been reappointed had it not been for the fact that he openly stated he was a communist and member of the PLP, he would not necessarily or automatically have been promoted to associate professor and given tenure.

29. As a result of the nonrenewal of his appointment at UALR, Cooper has not been able to obtain comparable teaching positions at other schools. Despite his diligent efforts to obtain such employment, Cooper has experienced periods of unemployment

and underemployment in the years since he left UALR.

## MEMORANDUM OPINION & CONCLUSIONS OF LAW

The Court is cognizant that "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint" and that "[b]y and large, public education in our Nation is committed to the control of state and local authorities." *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). *Accord, Board of Curators v. Horowitz*, 435 U.S. 78, 91, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). Consistent with fundamental constitutional safeguards, university officials have "comprehensive authority" to prescribe and control conduct in the schools. *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Similarly, a state university has the undoubted right to prescribe its curriculum, to select its faculty and students and evaluate their performances, and to define and maintain its standards of academic accomplishment. *See Board of Curators v. Horowitz, supra; Epperson v. Arkansas, supra*, 393 U.S. at 107, 115, 89 S.Ct. 266; *Shelton v. Tucker*, 364 U.S. 479, 485, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

On the other hand, "state colleges and universities are not enclaves immune from the sweep of the First Amendment. 'It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Healy v. James, supra*, 408 U.S. at 180, 92 S.Ct. at 2345, *quoting Tinker v. Des Moines Independent Community School District, supra*, 393 U.S. at 506, 89 S.Ct. 733. Thus, despite their

reluctance to intrude into the academic community, courts have on occasion found this necessary to ensure "[t]he vigilant protection of constitutional freedoms [which] is nowhere more vital than in the community of American schools." *Shelton v. Tucker, supra*, 364 U.S. at 487, 81 S.Ct. at 251. *Accord, Healy v. James, supra*, 408 U.S. at 180, 92 S.Ct. 2338.

A non-tenured faculty member has no right to continued employment beyond the duration and terms of his contract. The university is free not to rehire him for good reasons or for poor reasons or even "for no reason whatever." *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 283, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The decision not to rehire may not, however, be predicated on the teacher's exercise of constitutionally protected rights, particularly the First and Fourteenth Amendment guarantees of freedom of speech and association.[3] *Mt. Healthy City School District Board of Education v. Doyle, supra*, 429 U.S. at 283–84, 97 S.Ct. 568; *Perry v. Sindermann*, 408 U.S. 593, 597–98, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Shelton v. Tucker, supra*. When a non-tenured teacher alleges that he was not rehired in violation of his First Amendment rights, he bears the initial burden of establishing that his conduct was constitutionally protected and that this protected conduct was a "substantial factor" or a "motivating factor" in the school's decision not to reappoint him. *Mt. Healthy City School District Board of Education v. Doyle, supra*, 429 U.S. at 287, 97 S.Ct. 568. If this burden is sustained, the school then has the burden of showing by a preponderance of the evidence that it would have reached the same non-reappointment decision even in the absence of the protected conduct. *Id.*

---

**3.** While freedom of association is not explicitly set out in the First Amendment, it has been held to be implicit in the freedoms of speech, assembly and petition. *Healy v. James*, 408 U.S. 169, 181, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972).

Rights guaranteed to citizens by the First Amendment are made applicable to the states

by the Fourteenth Amendment. *Baird v. State Bar*, 401 U.S. 1, 5, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); *Esteban v. Central Missouri State College*, 415 F.2d 1077, 1085 (8th Cir. 1969), *cert. denied*, 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970).

■ The Court emphasizes that its function in this type of case is very limited. The Court does not review the merits of the University's decision not to rehire Cooper. "[I]t is not our function to evaluate a professor's competence nor to determine whether he any longer fits the needs of a school that is expanding its programs and attempting to upgrade the quality of its faculty. We may not so far involve this court in the discretionary decisions made by state-controlled colleges." *Cook County College Teachers Union, Local 1600 v. Byrd*, 456 F.2d 882, 889 (7th Cir.), *cert. denied*, 409 U.S. 848, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). *See Megill v. Board of Regents*, 541 F.2d 1073, 1077 (5th Cir. 1976). Rather, the Court's only function is to decide the merits of Cooper's constitutional claim, that is, to determine as a factual matter whether he was not reappointed because of his exercise of constitutionally protected rights.

■ "Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association." *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957). It is now beyond question that mere association with or membership in a communistic organization is protected activity for which a state may not impose civil disabilities such as exclusion from state employment. *Baird v. State Bar*, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); *United States v. Robel*, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Keyishian v. Board of Regents, supra; Sweezy v. New Hampshire, supra; Cummings v. Hampton*, 485 F.2d 1153 (9th Cir. 1973); *Boorda v. Subversive Activities Control Board*, 137 U.S.App.D.C. 207, 421 F.2d 1142 (1969), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970). "Mere knowing membership without a specific intent to further the unlawful aims of an organization is not a constitutionally adequate basis for exclusion from such posi-

tions as those held by [teachers in state universities]." *Keyishian v. Board of Regents, supra*, 385 U.S. at 606, 87 S.Ct. at 685. At trial, the University did not attempt to justify its decision by trying to prove that Cooper possessed the requisite specific intent.[4] Accordingly, the Court concludes that Cooper's membership in the PLP was constitutionally protected. *A fortiori* Cooper's right to state publicly that he was a communist and member of the PLP was also protected by the First Amendment.

Similarly, the Court concludes that Cooper's announcement of his personal political and philosophical beliefs in his classes was constitutionally protected. In *Tinker v. Des Moines Independent Community School District, supra*, the Supreme Court made clear that some in-class expression of political beliefs by teachers and students alike is protected. The Court stated the test as follows:

In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained.

*Id.*, 393 U.S. at 509, 89 S.Ct. at 738 (citation omitted).

It is evident that the bare announcement of Cooper's personal views did not materially or substantially disrupt his classes. In fact, it caused remarkably little concern until the matter was publicized by the media. The subsequent public reaction is not the kind of disruption that can be balanced

---

4. Indeed, based on Cooper's trial testimony, his "expressions tend to be an abstract kind of marxis[m] . . . call[ing] for social revolution at some future time but . . . nowhere call[ing] for the kind of immediate, violent ac-

tion that might constitute a direct threat" to the school or to the Nation. *Starsky v. Williams*, 353 F.Supp. 900, 926 (D.Ariz.1972), *aff'd in part, rev'd and remanded in part*, 512 F.2d 109 (9th Cir. 1975).

against a teacher's right to free expression. The Court does not imply that it was desirable or even appropriate for Cooper to have informed his classes of his personal beliefs, except to note that the college classroom is peculiarly suited to the "robust exchange of ideas." *Keyishian v. Board of Regents, supra*, 385 U.S. at 603, 87 S.Ct. 675. The Court concludes only that, at least in the context of a university classroom, Cooper had a constitutionally protected right simply to inform his students of his personal political and philosophical views.[5]

The Court is persuaded that this protected conduct was a substantial or motivating factor in the decision not to reappoint Cooper. Several factors point to this conclusion including the timing of the nonrenewal decision, the fact that during the three years prior to his joining the PLP Cooper was never informed that the University was seriously concerned about his performance as a teacher, the fact that Chancellor Ross's October 1973 meeting with Cooper focused almost exclusively on the matter of his beliefs, and the fact that prior to Cooper no full-time faculty member had ever been non-reappointed or dismissed from UALR.

More significant and more disturbing to the Court, however, is the political furor which followed the newspaper reports about Cooper, particularly the action filed by certain state legislators to remove Cooper from the University. The Supreme Court has emphasized the importance of maintaining our universities free of political intervention.

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so

thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy v. New Hampshire, supra*, 354 U.S. at 250, 77 S.Ct. at 1211–1212. *Accord, Keyishian v. Board of Regents, supra*, 385 U.S. at 603, 87 S.Ct. 675. Concurring in *Sweezy*, Justice Frankfurter stressed the "grave harm resulting from governmental intrusion into the intellectual life of a university" and concluded, "Political power must abstain from intrusion into this activity of freedom, pursued in the interest of wise government and the people's well-being, except for reasons that are exigent and obviously compelling." *Sweezy v. New Hampshire, supra*, 354 U.S. at 261–62, 77 S.Ct. at 1217.

Clearly, the University was under considerable public and political pressure to discharge Cooper. Although the University contested the state lawsuit and joined with Cooper in challenging the Arkansas statutes as unconstitutional, this does not compel the conclusion that it remained unswayed by external influences. Rather, for a variety of reasons it could well have determined that the prudent course was to publicly contest the suit while privately resolving the problem by non-reappointment.

■ Cooper having established that protected activity was a substantial or motivating factor in his non-reappointment, the burden shifted to the University to show that it would have reached the same decision even in the absence of the protected conduct. *Mt. Healthy City School District*

---

5. The Court intimates no view as to whether the same expression by a teacher in a public grade school or high school classroom would also be constitutionally protected. The Court emphasizes that its holding is strictly limited to a teacher's right simply to inform his students of his views and does not imply that a teacher has the right to proselytize students or to devote so much class time to such matters that his coverage of the prescribed subject matter is impaired.

*Board of Education v. Doyle, supra,* 429 U.S. at 287, 97 S.Ct. 568. The University attempted to prove that Cooper was not rehired because his performance as a teacher and scholar was unsatisfactory, as specified in the list of reasons given Cooper in explanation of the non-reappointment decision. The University demonstrated that there were weaknesses in Cooper's performance as a teacher. The Court is convinced, however, that these weaknesses would not have resulted in the non-reappointment decision had Cooper not joined the PLP and publicly acknowledged his communist beliefs. Again, the Court notes that prior to Cooper no faculty member had ever been dismissed or not rehired. Cooper was reappointed for three successive years. During these years, he was not advised of any serious dissatisfaction with his teaching. In fact, in the only previous faculty evaluation he was rated average or superior in every category. Significantly, this evaluation was prepared just two months before Cooper joined the PLP.

Moreover, as noted by the ad hoc faculty committee, the reasons originally given for the decision were ambiguous and poorly substantiated. Testimony about the various alleged student complaints was vague and undocumented. It is quite evident that at the time whatever complaints were made, they were not seriously investigated or considered by the department as reflecting adversely upon Cooper's performance. Similarly, although the University earlier had discounted student surveys and indicated they would not be used for faculty appointment decisions, such surveys were initially cited to support the University's decision.

The Court reiterates that in commenting on the paucity of the evidence to substantiate the University's reasons, it does not suggest that these would not have been legitimate or adequate reasons for non-reappointment. Nor does it imply that a university must be able to document and justify its personnel decisions. The Court recognizes that there may be "a very wide spectrum of reasons, some subtle and difficult to articulate and to demonstrate, for decid-

ing not to retain a [teacher]." *Roth v. Board of Regents,* 310 F.Supp. 972, 978 (W.D.Wis.1970), *aff'd,* 446 F.2d 806 (7th Cir. 1971), *rev'd,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Such decisions are in the discretion of the university and the Court does not review their merits.

However, in a case such as this one, when there has been a substantial claim that the decision was in derogation of First Amendment rights, the paucity of supporting evidence implies that the reasons given by the University were hastily prepared, makeweight reasons which do not fully reflect its true motivation. The Court concludes, therefore, that the University failed to sustain its burden of proving by a preponderance of the evidence that Cooper would not have been reappointed absent his protected conduct.

Several of the University's contentions require more detailed consideration because they pose very difficult constitutional questions. The University argues that Cooper's political philosophy was relevant to its non-renewal decision because he interjected his beliefs into the classroom not only by merely announcing that he was a communist and a member of the PLP, but also by announcing that he intended to teach, and by actually teaching, from the Marxist point of view. The University contends that along with its right to determine the curriculum and subject matter to be taught, it is the University's prerogative to determine that material should be presented from an objective point of view or from any other particular point of view. The ultimate question thus posed is whether Cooper's decision to teach his courses from a Marxist point of view was constitutionally protected so that if in fact this motivated his non-reappointment, his rights were violated.

■ Although academic freedom is not one of the rights enumerated in the First Amendment, it is now clear that it is entitled to some measure of constitutional protection. *See Healy v. James, supra,* 408 U.S. at 180–81, 92 S.Ct. 2338.

Our Nation is deeply committed to safeguarding academic freedom, which is of transcendant value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom . . . . The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection." *United States v. Associated Press*, D.C., 52 F.Supp. 362, 372.

*Keyishian v. Board of Regents, supra*, 385 U.S. at 603, 87 S.Ct. at 683. Yet, while the freedom is well recognized, its parameters are not well defined. The present case is particularly difficult because it involves a fundamental tension between the academic freedom of the individual teacher to be free of restraints from the university administration, and the academic freedom of the university to be free of government, including judicial, interference.

Case law considering the extent to which the First Amendment and academic freedom protect a teacher's choice of teaching methodology is surprisingly sparse and the results are not entirely consistent. *Compare Keefe v. Geanakos*, 418 F.2d 359 (1st Cir. 1969); *Sterzing v. Fort Bend Independent School District*, 376 F.Supp. 657 (S.D. Tex.1972), *vacated and remanded*, 496 F.2d 92 (5th Cir. 1974); *Mailloux v. Kiley*, 323 F.Supp. 1387 (D.Mass), *aff'd*, 448 F.2d 1242 (1st Cir. 1971); and *Parducci v. Rutland*, 316 F.Supp. 352 (M.D.Ala.1970) *with Brubaker v. Board of Education*, 502 F.2d 973 (7th Cir. 1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975); *Hetrick v. Martin*, 480 F.2d 705 (6th Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973); *Clark v. Holmes*, 474 F.2d 928 (7th Cir. 1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Ahern v. Board of Education*, 456 F.2d 399 (8th Cir. 1972); and *Parker v. Board of Education*, 237 F.Supp. 222

(D.Md.), *aff'd*, 348 F.2d 464 (4th Cir. 1965), *cert. denied*, 382 U.S. 1030, 86 S.Ct. 653, 15 L.Ed.2d 543 (1966). *See generally* Goldstein, *The Asserted Constitutional Right of Public School Teachers to Determine What They Teach*, 124 U.Pa.L.Rev. 1293 (1976); Miller, *Teacher's Freedom of Expression Within the Classroom: A Search for Standards*, 8 Ga.L.Rev. 837 (1974); *Developments in the Law—Academic Freedom*, 81 Harv.L.Rev. 1045 (1968).

The Court concludes, however, that this sensitive and difficult issue need not be reached in this case. At the time Cooper was notified he would not be reappointed he was not informed that the fact that he taught his classes from a Marxist point of view was one reason for the decision. This suggests this reason was an afterthought and not in fact a motivating factor in the discharge. The only one of the written reasons given to Cooper which is arguably related is reason 6. At trial, the University attempted to prove that because Cooper taught from the Marxist point of view, he deviated from the prescribed subject matter. However, there was little or no evidence that Cooper did not substantially cover the material. Furthermore, it is clear that there were no established standards or policies requiring that World Civilization or any other course be taught from any particular point of view or by any particular method. Different faculty members taught their courses from different points of view. Other than his express announcement of his point of view to his classes in the summer of 1973, Cooper's approach to his courses was substantially the same as it had been during his three previous years at UALR without objection. It is clear that other members of the History Department were aware from the time he joined the department that Cooper personally shared the Marxist interpretation of history and economics. The Court thus concludes as a matter of fact that had Cooper not become a member of the PLP and announced his personal beliefs to his classes, he would have been rehired, notwithstanding his Marxist viewpoint toward the teaching of history.

Moreover, several courts have held that academic freedom protects a teacher's choice of teaching methodology at least when, as here, the school has failed to establish standards or otherwise to notify the teacher that his methods are unacceptable. *Keefe v. Geanakos, supra; Sterzing v. Fort Bend Independent School District, supra; Mailloux v. Kiley, supra; Parducci v. Rutland, supra.*

> [P]articularly where the school board has not formulated standards to guide him, academic freedom affords a teacher a certain latitude in judging whether material is suitable and relevant to his instruction. "First Amendment freedoms need breathing space to survive . . . ." *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

*Brubaker v. Board of Education, supra* at 991 (Fairchild, J., dissenting).

> This exclusively procedural protection is afforded to a teacher not because he is a state employee, or because he is a citizen, but because in his teaching capacity he is engaged in the exercise of what may plausibly be considered "vital First Amendment rights." *Keyishian v. Board of Regents,* [supra, 385 U.S. at 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629.] In his teaching capacity he is not required to "guess what conduct or utterance may lose him [that] position." [Id.]

*Mailloux v. Kiley, supra* at 1392.

> When a teacher is forced to speculate as to what conduct is permissible and what conduct is proscribed, he is apt to be overly cautious and reserved in the classroom. Such a reluctance on the part of a teacher to investigate and experiment with new and different ideas is anathema to the entire concept of academic freedom.

*Parducci v. Rutland, supra* at 357.

If Cooper's nonrenewal had in fact been motivated by his teaching methods, the Court would be inclined to invoke this doctrine. However, in view of the conclusion that the decision was not so motivated, this need not be done. The Court also need not decide the more difficult question whether, should it so choose, a university may constitutionally prohibit teaching from a Marxist point of view.

■ Cooper's comments about the Banfield book raise other potentially sensitive questions about academic freedom on a university campus. The University contends that Cooper's criticisms of the book were unprofessional and that this was a legitimate consideration in the nonrenewal decision. It is clear that a teacher's out of class statements on matters of public concern are entitled to considerable constitutional protection. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Nevertheless, a teacher's rights are not absolute and must be balanced against the interests of the state as an employer. *Id.* at 568, 88 S.Ct. 1731. Thus, some cases have held that a university teacher's out of class statements are unprotected and may properly be the basis of a nonrenewal decision when the statements are such that they reflect adversely on the teacher's professional competence and judgment. *See, e. g., Megill v. Board of Regents,* 541 F.2d 1073 (5th Cir. 1976) (profane and factually false and misleading statements); *Duke v. North Texas State University,* 469 F.2d 829 (5th Cir.), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973) (profane and obscene language in public criticism of university policy). It is, however, the Court's opinion that had it not been for his other clearly protected conduct, Cooper would have been reappointed, regardless of what he said about the Banfield book. It is therefore unnecessary to decide whether his comments were unprofessional and properly subject to consideration by the University in making the non-reappointment decision.

■ In summary, the Court concludes that Cooper's membership in the PLP and his public acknowledgement of his beliefs, both inside and outside the University classroom, were protected conduct under the First and Fourteenth Amendments. The Court finds that this protected activity was a substantial or motivating factor in the University's decision not to reappoint Cooper. The University failed to prove by a

preponderance of the evidence that the same non-reappointment decision would have been made absent Cooper's exercise of First Amendment rights.

Cooper did not establish that he would automatically have been promoted to associate professor and granted tenure. The trial testimony was conflicting and the Court finds Cooper failed to meet his burden of proof on this issue. Accordingly, the Court orders that Cooper be reinstated to the position of assistant professor without tenure. The University is permanently enjoined from terminating Cooper's employment because of activities protected by the First and Fourteenth Amendments.

The parties dispute the propriety of a backpay award for the 1974–75 academic year during which the state court injunction was in effect. The University's position is essentially that it did not cause any injury Cooper may have suffered during that period. The University points out that it had every intention of permitting Cooper to teach that year as demonstrated by its offer of a terminal contract. He was not permitted to do so only because the University was obligated to comply with the state court injunction. The University actively contested the injunction by appealing it. The University contends that it was not also required to defy the injunction and risk contempt proceedings.

Cooper contends that the University could have accepted his offer to teach without pay since the state court order expressly enjoined only further payment of his salary. The Court finds this to be an unrealistically restrictive interpretation of the injunction. The Court agrees that the University's decision not to permit Cooper to teach during the 1974–75 academic year

was a reasonable attempt to comply with the injunction and that had it failed to do so, it would have risked being in contempt notwithstanding the fact that the statute was subsequently declared unconstitutional. *See Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); *Howat v. Kansas*, 258 U.S. 181, 42 S.Ct. 277, 66 L.Ed. 550 (1922).[6] Under these circumstances, the Court declines to award backpay for the period during which the University was subject to the state court injunction.

Cooper is awarded backpay running from April 7, 1975 to the date reinstatement is offered. Backpay shall be based on the difference between his actual earnings and what he would have earned had he remained at UALR as an assistant professor. The award shall include all salary-related benefits which would have accrued to Cooper had he remained in the University's employ. If the parties cannot agree on the backpay award, they shall within thirty days of this order submit to the Court their separate proposals for final determination by the Court.

Plaintiff's counsel are directed to submit affidavits within twenty days to enable the Court to award reasonable attorneys' fees and costs. Counsel for defendants may submit counteraffidavits within ten days thereafter.

The motion of defendant Williams that he be dismissed as a party to this action is granted.

After the backpay and attorneys' fees proposals and affidavits are submitted to the Court, the Court will enter a final judgment in accordance with this opinion.

---

**6.** An injunction duly issuing out of a court of general jurisdiction with equity powers, upon pleadings properly invoking its action, and served upon persons made parties therein and within the jurisdiction, must be obeyed by them however erroneous the action of the court may be, even if the error be in the assumption of the validity of a seeming but void law going to the merits of the case. It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished.

*Howat v. Kansas, supra*, 258 U.S. at 189–90, 42 S.Ct. at 280–281, *quoted in Walker v. City of Birmingham, supra*, 388 U.S. at 314, 87 S.Ct. 1824.