**Caroline S. CAMPBELL, Plaintiff,**

v.

**Louis L. RAMSAY, Jr., et al.,
Defendants.**

**No. LR–76–C–129.**

United States District Court,
E. D. Arkansas, W. D.

Feb. 13, 1980.

John T. Lavey, Little Rock, Ark., for plaintiff.

Nelwyn Davis, Asst. Atty. Gen., Little Rock, Ark., David Stewart, Fayetteville, Ark., for defendants.

## OPINION

ARNOLD, District Judge.

Caroline S. Campbell, formerly an instructor in mathematics at the University of Arkansas at Little Rock, claims that the University failed to reappoint her because of her sex. She asks for reinstatement and back pay, relying on Title VII of the Civil Rights Act of 1964, as amended in 1972, 42 U.S.C. § 2000e–2(a)(1), which prohibits employers from discriminating "because of . . . sex . . .," and on 42 U.S.C. § 1983. The case was tried to the Court on January 15, 16, 17, and 18, 1980.

Plaintiff has a B.S. in education from the University of Arkansas at Fayetteville, with a major in mathematics and social studies. In 1965 she received an M.A. from Louisiana State University in mathematics. In May or June of 1969 she was hired as an instructor in mathematics at the University of Arkansas at Little Rock, known as UALR, for the fall term 1969. Dr. John R. Hodges, professor of mathematics and head of the department at all times relevant to this case, hired plaintiff. She was employed again late in 1969 to teach the spring term 1970. Thereafter, Ms. Campbell was

given successive one-year reappointments for the school years 1970–71, 1971–72, 1972–73, 1973–74, and 1974–75. On April 23, 1974, Dr. Hodges informed her by letter that the next year, 1974–75, would be her last, and that she would not be reappointed for 1975–76. The parties agree, and the Court finds, that the stated reason for non-reappointment was Ms. Campbell's lack of a Ph.D. in mathematics.

Plaintiff attacks the action of the University on two theories: "disparate treatment" and "disparate impact." Each theory will be discussed in turn.

■■■ The Court of Appeals has recently discussed in depth the nature and order of proof required under these two theories of recovery in Title VII cases. See *Kirby v. Colony Furn. Co.*, 613 F.2d 696 (8th Cir. 1980). "[P]roof of discriminatory motive is critical in a disparate treatment case." At 702. But if plaintiff makes a prima facie showing of disparate treatment, the defendant then has the burden of going forward with the evidence. He must "articulate some legitimate, nondiscriminatory reason for the employee's" treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If the employer does come forward with such a reason, the inquiry is not at an end. Plaintiff still has "the opportunity to introduce evidence that the proffered justification is merely a pretext for discrimination." *Furnco Constr. Co. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978). Throughout the case, "[t]he burden of persuasion remains on the plaintiff; the plaintiff must convince the trier of fact by a preponderance of the evidence that the challenged employment practice is discriminatory." *Kirby v. Colony Furn. Co., supra,* at 703.

■ Plaintiff here made a prima facie case of disparate treatment. That is, she presented evidence of discriminatory motive sufficiently solid to require the University to go forward with evidence in reply. In deciding whether a prima facie case was made, the Court gives the plaintiff the benefit of all reasonable inferences to be drawn from her proof. Discrimination is hardly ever explicit in these times. The Court must be alert to subtle signs that it has occurred. Here, the department of mathematics (later renamed the department of mathematics and computer science) has hired only one woman since Little Rock University became the University of Arkansas at Little Rock in 1969. Thirteen men have been hired during these ten years. At one time there was a significant salary disparity between men and women at UALR doing substantially the same work. In fact, the University admitted this difference, and equitable adjustments were made for the school year 1973–74. Plaintiff herself received a substantial salary increase.[1] In addition, an incident that took place before plaintiff's non-reappointment indicates a suspect attitude on the part of Dr. Hodges, the department head who made the decision in question. Around Christmas time in 1972, Dr. Hodges told plaintiff he would like to replace her with "a minority Ph.D.," adding that "you don't really need the money teaching." This kind of remark is something Dr. Hodges probably would not have said to a man. Finally, the fact that plaintiff was the only person who failed to be reappointed during the entire history of UALR,[2] may lend some credence to the claim that her non-reappointment was not based on a lawful reason.

■ In response, defendants say simply that Ms. Campbell did not have a Ph.D. All

1. Plaintiff was apparently paid less than men doing comparable work during the school years 1969–70, 1970–71, 1971–72, and perhaps 1972–73. This pay disparity may have been unlawful under 42 U.S.C. § 1983 and, after 1972, under Title VII. No relief is requested in this respect.

2. Other than Grant Cooper, whose case is unique and unrelated to the issues here. See

*Cooper v. Ross*, 472 F.Supp. 802 (E.D.Ark. 1979) (Heaney, J., sitting by designation), *appeal pending*, No. 79–1787, 8th Cir. These facts were disclosed in answers to interrogatories made by the defendant on January 5, 1979, and received in evidence at trial. There was no proof whether any non-reappointment has occurred since that date.

of the justifications given for letting her go come back to this point: the lack of a "terminal degree," as it is known in academic parlance. Dr. Hodges was embarked on a consistent and long-continued effort to upgrade his department by purging it of all teachers without a doctorate in either mathematics or computer science. As a non-tenured instructor, plaintiff had no particular status or expectation of permanence, other than, of course, that she be treated in accordance with law. "A non-tenure appointment may be terminated effective at the end of an academic or fiscal year as the case may be at the option either of the individual or the University." 1973 UALR Faculty Handbook, p. IV–7; *accord,* 1974 Handbook, p. IV–8. Dr. Hodges wanted to avoid the granting of tenure—that is, permanent appointment—to a member of his department who had only a master's degree. He believed that Ms. Campbell would have become tenured had she been permitted to remain another year.[3] However that may be, Dr. Hodges also wanted newly hired teachers to have the Ph.D. He believed that persons with that degree could teach a broader range of courses and would improve his department's academic standing and reputation. The requirement of a Ph.D., a recognized credential in the academic community, was a legitimate and nondiscriminatory reason for not renewing plaintiff's employment. It is "a justification which is reasonably related to the achievement of some legitimate goal" of the University. *Furnco Constr. Co. v. Waters, supra,* 438 U.S. at 578, 98 S.Ct. at 2950.

The question remains whether plaintiff showed that this reason was merely pretextual. The Court holds that she did not, and

that on the whole case she has failed to carry the burden of persuading the trier of fact by a preponderance of the evidence that she was treated differently because of sex. The Court believes Dr. Hodges's testimony that the reason for his decision was the lack of a Ph.D., and that the plaintiff's sex had nothing to do with her non-reappointment. In other words, Dr. Hodges would have done exactly the same thing if plaintiff had been a man. The University advertised extensively for Ms. Campbell's replacement. Notices were placed in three magazines, including the Newsletter of the Association for Women in Mathematics, the only relevant women's publication known to the University at the time. Notices were also sent to all institutions in the United States then granting doctorates in mathematics. Each of the notices stated that a Ph.D. was required. Sixty applicants responded, 58 men and two women. A man with a Ph.D. was hired. It is true that none of the three finalists selected for interviews by Dr. Hodges was a woman, but this fact does not persuade the Court in plaintiff's favor for at least two reasons. First, the candidates for interview were selected only after Dr. Hodges had consulted with Neyland Hester, UALR's Director of Administrative Services and one of its equal-employment officers.[4] Mr. Hester's approach to affirmative action is positive and sensitive, although the University would be well advised to allow him to devote more of his time (he now spends about 15%) to this subject. His involvement in the process of finding a successor to Ms. Campbell is significant and reassuring. Second, at about the same time Dr. Hodges, acting for the department of mathematics, did hire a woman Ph.D.

---

**3.** The reason for this belief is not clear. The UALR Faculty Handbook states that an instructor receives tenure with an eighth yearly appointment. See PX 71, p. IV–7; PX 70, pp. IV–5, 6. Ms. Campbell could have served another year and still have been employed only seven years. Nevertheless, both parties have tried the case as though she would have become tenured had she been given one more contract. Perhaps her two half-year appointments in 1969 and 1970 are regarded as two appointments for tenure purposes. *But see* the

July 7, 1975, letter of President Charles E. Bishop, PX 66.

**4.** The other official with specific equal-employment responsibilities is Barbara Taegel, who is also Dean of Students at UALR. Ms. Taegel testified for defendants that she had told plaintiff she thought her non-reappointment was not based on sex. Ms. Taegel was a founding member of the Commission on the Status of Women at UALR.

■ The policy of increasing the number of Ph.D.'s in the department has been pursued consistently and successfully. No one without a Ph.D. has been hired since 1969, except for two teachers who had completed all requirements but the dissertation (referred to as "A.B.D."), both of whom subsequently received the degree. No one has ever been tenured without a Ph.D. In 1969 the department had one Ph.D. (Dr. Hodges) and six members with master's degrees (three men and three women, including plaintiff). In the current school year, 1979–80, it has 15 members, 13 of whom (11 men and two women) have the Ph.D. Both members with master's degrees only were with the department in the days of LRU, before UALR came into existence, and have been with it ever since. One of these two is a woman. Two members of the department, one man and one woman, have been given leaves of absence to obtain their Ph. D.'s. See DX 2. The doctorate requirement has been applied evenhandedly and was not a pretext. Plaintiff's disparate-treatment claim must fail. Her claim under 42 U.S.C. § 1983 likewise must be rejected for failure to prove discriminatory intent.

■ Plaintiff also claims that her non-reappointment was unlawful under a disparate-impact theory. If a facially neutral employment practice falls more harshly on one sex than the other, the burden shifts to the employer to show that the practice "is justified by business necessity." *Kirby v. Colony Furn. Co., supra,* at 703. If the employer makes such a showing, "the plaintiff may then show that other employment practices, which lack a similarly discriminatory effect, would satisfy 'the employer's legitimate interest in "efficient and trustworthy workmanship." ' " *Ibid.,* quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975), which in turn quoted *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. "Business necessity" is not an easy showing to make. "[T]he proper standard for determining whether 'business necessity' justifies a practice which has a . . . discriminatory result

is not whether it is justified by routine business considerations but whether there is a *compelling need* for the employer to maintain that practice and whether the employer can prove there is *no* alternative to the challenged practice." *Kirby v. Colony Furn. Co., supra,* at 705 n.6, citing *U. S. v. St. Louis—S.F. Ry.,* 464 F.2d 301, 308 (8th Cir. 1972) (en banc), *cert. denied,* 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973).

■ If the question were whether the Ph.D. requirement has adversely affected the receipt of tenure by women at UALR, it would be difficult for the Court to find a disparate impact. Of the 127 faculty members tenured since 1975–76, the first year after plaintiff's departure, 100 (70 men, 30 women) have had a doctorate. Of the 27 tenured without the doctorate, 20 have been women, and only 7 men. DX 13. Thus, if either sex has in fact been excluded from tenure because of the lack of a Ph.D., it would seem to be men, not women. Plaintiff argues that the departments in which women have been tenured without doctorates are traditionally or stereotypically female, but the record does not bear out the assertion. Women without a doctorate have been tenured in the departments of art, speech, English, nursing, library, economics and finance, music, secondary education, accounting, social work, foreign languages, and physical education. Men have been tenured without a doctorate in physics and astronomy, art, physical education, and social work. It is misleading and wrong to speak of any branch of learning as being more closely akin to one sex than the other, but even if such an approach were accepted, the proof here is to the contrary. Though nursing and library might be identified historically with women, economics and finance, accounting, and foreign languages are not. Women without a doctorate have been tenured in three of the four same departments as men without a doctorate. In short, tenure decisions show no gender-based pattern.

On the other hand, as indicated above, this is probably not a tenure case at all.

The action taken by the employer was not failure to confer tenure, nor was it failure to promote. It was non-reappointment. Plaintiff is the only person (with the single irrelevant exception already noted) ever to be given notice of non-reappointment at UALR. (Many other persons have left, but only because of death, resignation, or retirement.) If we focus on the department of mathematics and computer science, the Ph.D. requirement does seem to have hindered women more than men. No man was ever affected by the requirement. There are, moreover, proportionally fewer Ph.D.'s among women math teachers in college, than among men. Of all college teachers of mathematics, 81.8% are men, and 18.2% are women. Of Ph.D.'s in mathematics, however, 89.7% are men, and 10.3% are women. DX 11, Availability Data in Academic Professions and Related Occupations (2d ed. 1978). Out of each group of 100 math teachers, therefore, women will more likely be disadvantaged by lack of a doctorate than men. The requirement did have a disparate impact on women as a class.

■ Has the defendant nevertheless proved business necessity? In approaching this question, the Court assumes that in order to prevail the University must carry not only the burden of producing evidence, but also the burden of persuasion on this issue.[5] Ms. Campbell was an excellent teacher, and a Ph.D. could not have taught her courses any better than she did. Those courses were mainly freshman-level, and included many students without much background in mathematics. In this sense, it was not "necessary" to replace her with a Ph.D. If she had been kept on, the students in her courses would not have been hurt, and the University would still be standing. The concept of business necessity, however, is not so narrow. The Ph.D. requirement must be evaluated in a broader context. A doctorate requires specializa-

tion in one aspect of the discipline—for example, analysis or algebra. A Ph.D. is by hypothesis an authority in some aspect of his or her field—a person who has written a publishable dissertation which has been successfully defended against oral examiners who are trained devil's advocates. A Ph.D. can teach the same courses plaintiff did, and more. The department gets greater flexibility in faculty assignments by hiring a teacher with a doctorate. In addition, its prestige and drawing power are increased among its academic peers by adding to the number of Ph.D.'s among its members. As Dr. Mary Jane Gates, a member of the UALR department of mathematics, testified, a Ph.D. is necessary to be "competitive" in the academic world, or at any rate in mathematics.

This view is reinforced if the problem is approached from a University-wide perspective. In the ten years since LRU was merged into the University to become UALR, there has been a consistent effort to raise the academic status of the Little Rock campus. One of the principal ways of doing that is to increase the number of Ph.D.'s on the faculty.[6] At the time of the merger, Ph.D.'s were about one third of the whole faculty. They are now two thirds, and the goal of UALR is 75 to 80 per cent. The campus has been and remains in a state of transition, gradually becoming more comprehensive and scholarly, moving into graduate and professional educational. As this process continues, judgments about UALR are being formed in the world of higher education, and one of the common criteria used is the number of earned doctorates on the faculty. In fact, this criterion is one of the factors used in monitoring UALR by the North Central Association, the agency by which the University is accredited.

The defendant has established by a clear preponderance of the evidence that the requirement of a Ph.D. in mathematics is a

---

5. The question is still open in this Circuit. See *Kirby v. Colony Furn. Co., supra*, at 703–704 n.5.

6. The term Ph.D. (Doctor of Philosophy) is used throughout this opinion, but the same

reasoning applies to any so-called "terminal" degree, *e. g.*, a D. Mus. (Doctor of Music), D.F.A. (Doctor of Fine Arts), or S.J.D. (Doctor of Juridical Science).

business necessity. It is no answer to point out that not every department had such a requirement. The University may lawfully grant its department heads a large measure of autonomy, and mathematics is not one of those departments in which, in the judgment of the President of the University, doctorates are not critical. Plaintiff suggests that only "traditionally female" departments are exempted from the general policy in favor of Ph.D.'s, but the record is to the contrary. One department in which doctorates are not required, for example, is law. The reason, no doubt, has nothing to do with men and women. S.J.D.'s are simply much rarer than Ph.D.'s.

Finally, is there any alternative to the Ph.D. as a hallmark of academic distinction? The answer is no, except in rare instances where demonstrated scholarship or theoretical publications may serve as an equivalent.[7] In general, the earned doctorate is a unique credential. It is, in the words of one witness, a "union card," a *sine qua non*, without which most people are not taken seriously in the world of higher education.

The Court therefore concludes that plaintiff cannot prevail on either theory. This result is based on application of the *Kirby* standards to the particular facts of this case. Citation of authority is therefore not especially helpful. What few cases there are on the effect of a terminal-degree requirement on a claim for sex discrimination do appear to point in the same direction. See *Cooper v. University of Texas*, 482 F.Supp. 187 (N.D.Tex.1979); *Kunda v. Muhlenberg College*, 463 F.Supp. 294, 310, 311–12 (E.D.Pa.1978); *Keyes v. Lenoir Rhyne College*, 15 FEP Cases 914, 923 (W.D.N.C. 1976), *aff'd*, 552 F.2d 579 (4th Cir. 1977), *cert. denied*, 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977). *Cf. Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106, 111 n.7 (1st Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980).

Judgment will be entered dismissing the complaint with prejudice.

---

7. Einstein did not have a Ph.D., but most mathematics teachers are not Einstein.