The Honorable Clark Hall State Representative 302 Elm Street Marvell, AR 72366-8729
Dear Representative Hall:
I am writing in response to your request for my opinion regarding the legality of the following bills:
 1. SB22, an act to regulate the selection and use of textbooks and course materials at state-supported institutions of higher education; minimize the cost of textbooks and course materials; and other purposes;
 2. SB23, an act to regulate the selection and use of textbooks and course materials at state-supported institutions of higher education; prohibit certain single-use textbooks and course materials; minimize the cost of textbooks and course materials; and other purposes; and
 3. SB25, also an act to regulate the selection and use of textbooks and course materials at state-supported institutions of higher education and prohibit certain single-use textbooks and course materials; minimize the cost of textbooks and course materials; and other purposes.
RESPONSE
In my opinion, all three bills are vulnerable to attack pursuant to Ark. Const. amend. 33 in that they would impose blanket restrictions on institutions of higher education regarding the use of instructional materials. As this office has *Page 2 
previously opined, Amendment 33 likely requires an institution-by-institution review of any legislative restriction placed upon an institution of higher learning, focusing on whether the restriction encroaches upon a substantive power that has vested in the institution's board by long practice. The proposed legislation is inconsistent with this principle. All three bills might further be assailable as violating the free speech provisions of U.S. Const. amend. 1
and Ark. Const. art. 2, § 6. The scope of First Amendment protections of academic speech is unclear under current law, and any First Amendment analysis would in any event entail conducting a factual review in each instance of the sort I am neither authorized nor equipped to conduct. Of the three bills, I believe SB 25 is particularly vulnerable to assault under the First Amendment because it discriminates as to the content of college textbooks. I further believe the provisions of this bill are vulnerable as unconstitutionally vague.
Question 1: SB22
Senate Bill 22 proposes to add a new subchapter to title 6, chapter 60 of the Arkansas Code. If enacted, the bill would add the following provisions:
 6-60-601. Selection and use of textbooks and course materials.
 (a) A state-supported institution of higher education in this state shall establish and implement policies, procedures, and guidelines for the selection and use of textbooks and course materials for undergraduate courses that encourage efforts to minimize the cost of textbooks and course materials for students while maintaining the quality of education and academic freedom.[1] *Page 3 
 (b) The policies, procedures, and guidelines described in subsection (a) of this section shall require that before the selection of a textbook or course material is finalized, the appropriate faculty member shall:
 (1) Affirmatively confirm his or her intent to use all items selected, including all items sold as part of a bundled package;
 (2) Confirm that some components of a bundled package may not be reusable by another student;
 (3) Affirmatively acknowledge the quoted on-campus retail price for each textbook or course material he or she selects; and
 (4) Confirm that the publisher of a textbook or course material has acknowledged that all components of a bundled package may be purchased and sole separately by a local textbook retailer.
 (c) As used in this section, "bundled package" means any combination of one (1) or more reusable textbooks and one (1) or more non-reusable textbooks, workbooks, CD-ROMs, floppy disks, passwords, interactive hand-held remote devices, flash drives, or any other memory-storing device as a package for sale. *Page 4 
 (2) No state-supported institution of higher education in this state shall select or use for instruction a bundled package if:
 (A) Any component of the package is not offered for sale individually; and
 (B) The cost of purchasing the items packaged together as one (1) purchase equals or exceeds the cost of purchasing the items individually.
 (3) Before a bundled package is adopted the publisher:
 (A) Must disclose the cost of:
 (i) Each component of the bundle; and
 (ii) The bundled package; and
 (B) Acknowledge that retailers will be able to purchase the individual and bundled items at the stated costs.
Amendment 33 Analysis
In my opinion, SB22 raises precisely the constitutional issue I recently addressed in the attached Ark. Op. Att'y Gen. No. 2007-007. At issue in my previous opinion was the constitutionality of HB2697 of 2005, which the proposed sponsor had withdrawn during the 2005 session in the wake of concerns expressed regarding its constitutionality in light of the provisions of Ark. Const. amend. 33, which provides in pertinent part:
 § 2. Abolition or transfer of powers of board or commission — Restrictions.
 The board or commission of any institution, governed by this amendment, shall not be abolished nor shall the powers vested in any such board or commission be transferred, unless the institution is abolished or consolidated with some other State institution. . . . *Page 5 
The effective date of Amendment 33 was January 15, 1943. With some qualifications, the proposed legislation at issue in my previous opinion would have frozen the tuition of students in Arkansas institutions of higher learning at whatever rate applied when the student matriculated as a freshman. This legislation was closely akin in its motivation to SB22, which likewise appears designed to mitigate burgeoning educational expenses by legislatively dictating price controls — in the present case, controls on the prices of textbooks and related educational materials.
In Opinion No. 2007-007, I offered the following summary of what I took to be the pertinent inquiry:
 [T]he fundamental constitutional issue regarding HB2697 of 2005 is whether the legislature's freezing of tuition at freshman-year rates for students in any public institution of higher learning would encroach on a power "vested" in that institution's board, thus violating the provisions of Amendment 33. For reasons discussed in detail below, I am unable to opine definitively whether HB2697 would be deemed constitutional in the wake of such an inquiry. My uncertainty on this score is based in part on problems of construction arising from Amendment 33 itself. It is unclear whether the power must have been "vested" as of the date of Amendment 33's adoption or whether the power might have "vested" subsequently. It is further unclear what it means for a power to "vest," although one of my predecessors has plausibly speculated it would suffice (1) if the board has traditionally exercised the power and (2) if the power involves the making of substantive policy. [See the attached Ark. Op. Att'y Gen. No. 2000-007.] Finally, assuming that setting tuition policy is a power within the contemplation of Amendment 33 — a proposition that is far from settled — I question whether it would be appropriate for the legislature to enact a blanket policy applicable to all institutions of higher learning, since Amendment 33 requires a case-by-case analysis regarding whether a power falling within its ambit has "vested" in an institutional board.
With respect to the question of when an institutional power must have "vested" in order to insulate it from legislative encroachment, in Opinion No. 2007-007, I paraphrased and adopted my predecessor's conclusion as follows: *Page 6 
 Although the issue would benefit from judicial clarification, I further believe that such prerogatives might be established at any point in time and that it would be strained to suggest that Amendment 33 was intended to cut off the evolution of institutional authority at an arbitrary point in time — namely, the amendment's effective date.
I consequently concluded that the appropriate course would appear to be to determine on an institution-by-institution basis whether the board had traditionally exercised the authority to set tuition and whether the setting of tuition amounted to a matter of substantive policy. I further concluded that the case-specific nature of any such inquiry might preclude adopting any blanket legislation of the sort at issue in HB2697. However, I qualified this suggestion somewhat by noting that the legislature has traditionally and without apparent challenge either itself made or delegated to other agencies decision-making authority regarding tuition policy at the subject institutions. I concluded that in light of the legislature's historic control over tuition policy, legislation relating to tuition would in all likelihood survive a challenge based upon Amendment 33 so long as the legislation would not jeopardize an institution's viability.
I believe a similar analytical approach is warranted in addressing the provisions of SB22, which if enacted would institute a policy with respect to textbooks and other course materials that will be generally applicable to all institutions of higher education. As previously noted, I harbor some reservations about proposed legislation seeking to impose blanket restrictions on established institutions of higher learning. I believe a court reviewing the issue might at the very least focus intently on the nature of the restrictions the proposed legislation would impose on academicians, whose selection of instructional materials has traditionally been deemed to lie at the heart of an institution's educational autonomy. Having acknowledged this potential concern, I am nevertheless struck by the fact that the proposed legislation, at least on its face, if possibly not in its effects, is content-neutral in its restrictions, see discussion of First Amendment issues below, focusing exclusively on means that might minimize the cost to students of educational supplies whose subject matter, absent practical restrictions on access to materials resulting from the legislation, will be solely the institution and the professor's to determine. In this regard, I am further struck by the statement of purpose set forth in the proposed A.C.A. § 6-60-601(a), which provides:
 A state-supported institution of higher education in this state shall establish and implement policies, procedures, and guidelines for the selection and use of textbooks and course materials that encourage efforts to minimize the cost of textbooks and course materials for students while maintaining the quality of education and academic freedom. *Page 7 
(Emphasis added.) Again purely as a matter of principle, if possibly not of practice, this statute both locates primary policymaking authority regarding course work in the state-supported institution itself and acknowledges the overarching importance of quality education and academic freedom. Although the statute further imposes certain procedural policies regarding educational materials, a court upon considering the practical consequences of the proposed legislation might conclude that these are merely content-neutral mechanisms designed to ensure that students pay the lowest prices possible for materials freely chosen at the institutional level.
Having acknowledged that the proposed legislation is facially neutral with respect to content, I must note that I consider several provisions of the proposed statute troubling. Subsection (b)(4), for instance, would flatly preclude ordering material "bundled" together if the individual materials included in the bundle are not available for separate purchase. It may be that this provision would effectively foreclose the possibly vested discretion of an institution and its faculty to select certain instructional materials. Not being a finder of fact, I cannot opine as to whether this restriction might run afoul of Amendment 33. I can only point out that a reviewing court might inquire into the likely factual consequences of this restriction, specifically with an eye to determining whether it encroaches on powers vested in a particular institution.
As should be apparent from the foregoing, I am not situated to opine definitively whether a reviewing court would conclude that SB22 is consistent with the restrictions of Amendment 33. Under the circumstances, I can do no more than express my concern that Amendment 33 might require an institution-by-institution review of any legislation purporting to restrict an institution's choice of required classroom materials. If a court determines that the choice of such materials involves a matter of substantive policy — a proposition I find highly plausible on its face — and if the court further determines that an institution's professors, possibly in conjunction with university officials, have traditionally exercised the unrestricted choice of such materials, the court might conclude that the legislature is precluded from restricting the institution's autonomy in this area. However the court might resolve such an inquiry, Amendment 33 appears to contemplate that *Page 8 
its resolution should be undertaken on an institution-by-institution basis, thus calling into question blanket legislation of the sort at issue in your question.
First Amendment Analysis
Insofar as SB22 might be read as imposing restrictions on the dissemination of information in college classrooms, it further implicates the guarantee of free speech set forth in the Arkansas and United States Constitutions. See U.S. Const. amend. 1 and Ark. Const. art. 2, § 6. In my opinion, the choice of instructional material in institutions of higher education is clearly a variety of speech for purposes of First Amendment analysis, raising the question of what restrictions the government might impose.
Inasmuch as the speech at issue is associated directly with the performance of the professor's duties as a public employee, subject either to his employing institution's supervision or to legislative oversight, the scope of First Amendment protections might be attenuated by the principles explored in Garcetti v. Ceballos, ___ U.S. ___,126 S.Ct. 1951 (2006), which reviewed the dismissal of a deputy district attorney who in a memorandum to his supervisors had questioned the accuracy of a search warrant crucial to an ongoing prosecution — a memorandum that was publicized in a hearing challenging the warrant. In an action challenging the deputy prosecutor's dismissal, the district court ruled that the memorandum was not protected speech because the deputy prosecutor wrote it pursuant to his employment duties. The Ninth Circuit Court of Appeals reversed, holding that the memo was protected speech under the principles set forth in Pickering v. Board of Educationof Township High School District 205, 391 U.S. 563 (1968). Ceballos v.Garcetti, 361 F.3d 1168, 1173 (Ninth Cir. 2004). In Garcetti, the Supreme Court reversed the Ninth Circuit.
The Court in Garcetti began its analysis by reciting the following fromPickering:
 "The problem in any case . . . is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."
Garcetti, 126 S.Ct. at 1957, quoting Pickering, 391 U.S. at 568. The Court in Garcetti extended the Pickering analysis by declaring: *Page 9 
 A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.
126 S.Ct. at 1958. The Court further remarked:
 Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. Cf. Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes").
126 S. Ct. at 1960. The Court elaborated as follows:
 Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity.
Id.
Given that SB22 restricts the range of materials a professor might require his students to purchase, the legislation would appear to be a limitation on free speech rights. However, it is a limitation directly related to a university's operations, which are clearly affected by the affordability of instructional materials. Under the principles discussed immediately above, then, a reviewing court might conclude that the restrictions set forth in SB22 would withstand a First Amendment challenge.
Having ventured this tentative conclusion, I must note a significant concession by the majority in Garcetti regarding a point raised in Justice Souter's dissent. The majority observed: *Page 10 
 Justice SOUTER suggests today's decision may have important ramifications for academic freedom, at least as a constitutional value. See post, at 1969-1970. There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence. We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.
Id. at 1962. Justice Souter in particular took issue with the majority's broad contention that a government employer could restrict government speech simply because any such restriction amounted to no more than "employer control over what the employer itself has commissioned or created." Id. at 1960. Justice Souter responded as follows to this formulation:
 This ostensible domain beyond the pale of the First Amendment is spacious enough to include even the teaching of a public university professor, and I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write "pursuant to official duties." See Grutter v. Bollinger, 539 U.S. 306, 329, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) ("We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition"); Keyishian v. Board of Regents of Univ. of State of N.Y., 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629
(1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. `The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools'" (quoting Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)); Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (a governmental enquiry into the contents of a scholar's lectures at a state university "unquestionably was an invasion of [his] liberties in the areas of academic freedom and political expression — areas in which government should be extremely reticent to tread"). *Page 11 
As both this passage and the majority's acknowledgment of Justice Souter's objection suggest, the concept of "academic freedom" apparently triggers a heightened sensitivity to First Amendment issues.[2]
However, to date, the Court has not articulated any bright-line test that might apply in cases of governmental strictures on expression within a university context.[3] I consequently can offer no more than a caveat that the Garcetti court's apparent approval of restrictions on employee speech if the restrictions advance the state's interests may be qualified in the case of a university's syllabus choices. This possibility has prompted one commentator to remark:
 [A]rguments applying to publicly-funded speech may not be relevant in a university setting. Accordingly, placing curriculum decisions in the legislature would insufficiently guide universities and, as a result, be void for vagueness.
Laura A. Jeltima, Legislators in the Classroom: Why State LegislaturesCannot Decide Higher Education Curricula, 54 Am. U. L. Rev. 215, 232 (2004). Although one might question whether a legislative mandate regarding curriculum would be necessarily vague, it remains the case that academic speech is at times treated with particular reverence in the course of First Amendment discussions. That said, I must reiterate that the Court in Garcetti, which was decided after the commentator published her article, appears deliberately to have avoided opining on the degree of institutional and professorial autonomy that attaches with respect *Page 12 
to classroom instruction. One commentator has remarked on this judicial reticence as follows:
 Universities maintain substantial control over the content of other academic speakers. Indeed, content discrimination, a virtual per se violation of the First Amendment in most contexts, is not only often permissible in academic settings, but the exercise of content discrimination is also sometimes necessary to facilitating academic freedom, as in the instance of a university's decision regarding its curricular choices. . . .
 Thus, despite the fact that the identical values advanced by First Amendment protection of speech in other contexts would be promoted by a law of constitutional academic freedom, the same doctrinal tools that courts use to check other government restrictions on speech do not and cannot apply in the higher education context. In the absence of clear guidance, however, courts continue to be mystified about what tools should apply.
 * * * . . . Nearly fifty years after the introduction of the phrase "academic freedom" into the judicial discourse, the Supreme Court still has not carefully delineated the boundaries of a constitutional academic freedom doctrine.
Alan K. Chen, Bureaucracy and Distrust: Germaneness and the Paradoxes ofthe Academic Freedom Doctrine, 77 U. Colo. L. Rev. 955, 966-68 (2006) (footnotes omitted).
Although I concur with Professor Chen's analysis, the Supreme Court has not been entirely cryptic with regard to the bounds of academic freedom. For instance, in a concurrence later echoed in Bakke, 438 U.S. at 312
(1978), Justice Frankfurter itemized various elements of institutional autonomy in a university:
 It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail "the four essential freedoms" of a university to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study. *Page 13 
Sweezy, 354 U.S. at 263. With respect to the general issue of what may be taught and how, this pronouncement may well be dictum in bothSweezy and Bakke, although the Court in Sweezy made clear that the government cannot grill a university lecturer for evidence of subversion in the content of his lectures. 354 U.S. at 249-50. However, it nevertheless reflects a profound respect for the autonomy of universities and, subject to qualified university supervision, to university faculty.
The frequent judicial expressions of reverence for the concept of academic freedom raise the question carefully avoided by the Court inGarcetti — namely, whether the pertinent free-speech inquiry in a public academic context is not the general public-employment standard articulated in Garcetti itself, but rather a more stringent standard of the sort applicable to private speech, which focuses at least in part on whether government regulation of speech is content-neutral. See, e.g.,Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622 (1994). In my opinion, SB22 would not impose any governmental controls over the content of messages expressed by universities and their professors. Rather, the legislation appears designed only to regulate the costs of classroom materials, irrespective of content. As the United States Supreme Court noted in Turner, 512 U.S. at 642:
 [R]egulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, see Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984), because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.
In the related case of Turner Broadcasting System, Inc. v. FCC,520 U.S. 180,187 (1997), the Court defined the applicable standard of scrutiny as follows:
 [U]nder the intermediate level of scrutiny applicable to content-neutral regulations, must-carry [cable service] would be sustained if it were shown to further an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions did not "`burden substantially more speech than is necessary to further'" those interests. *Page 14 
(Citations omitted.)
In my opinion, given the burgeoning costs of college instructional materials, a reviewing court might well characterize saving students money on the purchase of such materials as "an important or substantial government interest." As discussed above, the question of how much the restrictions set forth in the bill might burden speech by possibly rendering certain materials unavailable for classroom use is one of fact that I am neither equipped nor authorized to address. I can do no more than opine that a reviewing court might apply the standard just recited in reviewing the pertinent facts.
In offering this admittedly tentative conclusion, I must again stress that content neutrality would appear to be an issue primarily with respect to legislative restrictions on curricula. As Professor Chen aptly points out, see 77 U. Colo. L. Rev., supra at 967, universities regularly engage in content discrimination with respect to the approval of curricula and review of professors. The issue raised by your question, it seems to me, is whether the legislature's proposed restrictions as set forth in SB22 might encroach on academic freedoms — an issue that would appear to implicate the question of content neutrality, although the Court in Garcetti, not being directly faced with the question, left the issue open for later resolution. In this regard, I will note that SB22 is not content-discriminatory on its face. Nevertheless, I must further note that, totally apart from the question of whether control over curricula has "vested" under Amendment 33, courts concerned with the concept of academic freedom might look askance at any legislative intrusion into an institution's choice of textbooks and instructional materials.
Question 2: SB23
Senate Bill 23 likewise proposes to add a new subchapter to title 6, chapter 60 of the Arkansas Code. If enacted, the bill would add the following provisions:
 6-60-601. Single-use textbooks and course materials prohibited.
 (a) As used in this section, "single-use textbooks or course material" means a textbook or course material containing removable pages or other material that render the textbook or course material incapable of use by a subsequent user of the textbook or course material taking the same or similar class. *Page 15 
 (b) No state-supported institution of higher education in this state shall select or use for instruction any single-use textbook or course material for any undergraduate course, except a workbook or lab manual if at least twenty-five percent (25%) of the pages of the workbook or lab manual are required to be consumed by the student to complete assigned course projects or lessons.
 (c) A violation of subsection (b) of this section:
 (1) Shall be reported within ten (10) business days by the state-supported institution of higher education to the:
 (A) Chief academic officer of the institution;
 (B) Chief legal counsel of the institution; and
 (C) Legislative Council; and
 (2) May be reported to the parties identified in subdivision (c)(1) of this section by any business or consumer.
Amendment 33 Analysis
The analytical approach to be followed in testing the constitutionality of SB23 under Amendment 33 of the Arkansas Constitution is the same as that outlined in my response to your first question. Again, assuming an institution were to challenge this legislation as encroaching on a purportedly vested right of the institution to select whatever course materials it deems appropriate, I believe a reviewing court would likely inquire whether the institution's board has traditionally exercised the authority to select or to supervise the selection of course materials and whether the selection of such materials amounts to a matter of substantive policy. As in my analysis of SB22, assuming the power at issue were deemed to implicate substantive policy, I question whether the need to conduct an historical inquiry regarding past practice at each institution could be reconciled with the proposed legislation's blanket proscription regarding practices at all institutions of higher education. Consequently, I believe a reviewing court might well find the proposed legislation unconstitutional. *Page 16 
First Amendment Analysis
As with the provisions of SB22, a court reviewing the provisions of SB23 would inquire whether the legislation encroached on the academic freedom of the educational institution or its professors. The court might further apply the standard of intermediate scrutiny discussed above in order to determine whether the legislation offended the First Amendment. The restrictions set forth in SB23 are content-neutral, meaning that the legislation would pass muster so long as it served an important government interest and did not unduly burden speech activities. SeeTurner, supra. Again, I believe a court might well characterize saving students money on supplies the purchase of such materials as "an important or substantial government interest." As discussed in my response to your first question, the question of how much the legislation might burden speech by restricting the scope of materials available for use by professors is one of fact that I cannot address.
SB23 has particularly occasioned the concern of the Association of American Publishers, Inc. ("AAP"), whose counsel has submitted to me a letter brief strongly questioning the constitutionality of all three bills. In support of AAP's objections to the proposed qualified proscription against assigning single-use textbooks in public undergraduate classes, counsel has cited much of the Supreme Court jurisprudence discussed above, which lends general support to the concept of academic freedom. He has further quoted an Arkansas federal district court's pronouncement that "a state university has the undoubted right to prescribe its curriculum," Cooper v. Ross,472 F.Supp. 802, 809 (E.D. Ark. 1979) — a proposition that, considered out of context, may be too categorical, given that it is clearly subject to the constitutional considerations discussed in this opinion.[4] *Page 17 
Counsel further recites the Eighth Circuit Court's pronouncement inBerg v. Bruce, 112 F.3d 322, 339 (8th Cir. 1997) (quoting Parate v.Isibor, 86 F.2d 821, 830 (6th Cir. 1989)), that "[a]cademic freedom is designed to `protect the individual professor's classroom methods from the arbitrary interference of university officials'" — a formulation that begs the question both in that a university's control over faculty is not at issue here, whereas the possible "arbitrariness" of the proposed legislation is very much at issue.
In questioning the constitutionality of the proposed legislation, AAP's counsel further relies heavily on a Puerto Rican federal district court case, Associacion de Educacion Privada de Puerto Rico, Inc. v. GarciaPadilla, 408 F.Supp. 2d 62 (D. Puerto Rico 2005).[5] The district court in Padilla held that the pertinent regulation, which required that students be allowed to purchase previous editions of a textbook if the latest edition made no significant change, impinged on academic freedom in part for the following reason:
 Requiring the use of two textbook editions will be highly burdensome to private schools and their teachers who will have to draft two different sets of lesson plans for each course; contend with resultant class management problems and disruptions; and employ teaching methods that the schools and teachers do not find effective or do not want to utilize.
Id. at 72. Perhaps because the academic speech at issue occurred within the context of private schools, the court without hesitation or elaborate discussion interpreted the pertinent standard as being intermediate scrutiny, which it declared to mean that the regulation should be upheld "if it is narrowly tailored to serve a significant governmental interest and leaves open ample alternative channels of communication." Id. at 76. After conducting a factual review of all aspects of the pertinent regulation, the court concluded that it was not narrowly tailored to the goal of saving students money on instructional material and did not leave open *Page 18 
ample alternative channels for communication by the private schools.Id. at 77-78. Accordingly, the court declared the regulation unconstitutional. Id.
Although Padilla is generally illustrative of the scrupulous judicial attention to questions of academic freedom, the issues it addressed are also distinguishable in some sense from those presented in your request. First, Padilla dealt with government restriction of private speech, not speech in public institutions of higher learning. Although, as the court in Padilla pointed out, "[a]cademic freedom `includes the interest of educational institutions, public as well as private, in controlling their own destiny and thus in freedom from intrusive judicial [and governmental] regulation," id. at 74 (quoting Crowley v. McKinney,400 F.3d 965, 969 (7th Cir. 2005)) (emphasis added; brackets inPadilla), the question remains whether the intermediate scrutiny clearly applicable to content-neutral private speech controls or whether the principles set forth in Garcetti, supra, might warrant a more relaxed scrutiny of governmental restrictions of the sort at issue here. The factual question likewise remains whether the restrictions set forth in SB23 could indeed be characterized as "intrusive" under the standard just recited. Finally, SB23 is distinguishable from the regulation at issue in Padilla in that allowing different editions of a textbook in a class would obviously generate practical problems of reference that would not arise if all students in a given semester were required to buy new versions of a textbook with removable pages that rendered it insusceptible to resale. In my opinion, then, the constitutional analysis offered by the court in Padilla is not controlling to the extent that AAP suggests. Again, I believe a reviewing court would base its analysis not on an automatically dispositive standard of "academic freedom," but rather upon either the intermediate scrutiny analysis discussed above or upon the principles set forth in Garcetti,supra.
Question 3: SB25
Senate Bill 25 proposes to add a new subchapter to title 6, chapter 60 of the Arkansas Code. If enacted, the bill would add the following provisions:
 6-60-601. Customized textbooks and course materials prohibited.
 (a)(1) As used in this section, "customized textbook or course material" means an undergraduate textbook or course material that contains information that: *Page 19 
 (A) Includes supplemental information, logos, design features, or any other information specific to the college, university, technical institute, geographic area, or state;
 (B) Produces no substantive change to the main text; and
 (C) Is listed or treated by a state-supported institution of higher education as the textbook or course material required for a class to the exclusion of a textbook or course material containing the main or substantially similar text whether or not the supplemental information or alteration results in a new International Standard Book Number for the textbook or course material required for the class.
 (2) "Customized textbook or course material does not include a publication of selected segments or chapters of one (1) or more undergraduate textbooks or course materials if the retail cost of the publication is no more than fifty percent (50%) of the retail cost of the complete textbooks or course materials when purchased new.
 (b) Except as provided in subsection (c) of this section, no state-supported institution of higher education in this state shall select or use for instruction any customized textbook or course material.
 (c) A customized textbook or course material may be adopted after the effective date of this act if:
 (1) The adoption is approved by the department chair and the dean of the affected college; and
 (2) The dean or division head of the college forward to the chief academic officer of the affected state-supported institution of higher education the following information:
 (A) A list of each adoption;
 (B) The names of the person or persons responsible for each adoption; and *Page 20 
 (C) A written statement explaining the reason for adoption.
Amendment 33 Analysis
I believe a court's approach in testing this proposed legislation under Amendment 33 would proceed precisely as I have described in my response to your previous questions — namely, by inquiring whether the legislation encroaches on a power that has vested in the institution through long practice and that is substantive in character. As noted above, any such inquiry will necessarily be both factual in nature and institution-specific, again casting into doubt whether blanket legislation of the sort at issue would be deemed consistent with the strictures of Amendment 33.
First Amendment Analysis
SB35 differs from the bills previously discussed in that it in fact does purport to regulate the content of textbooks and course materials. It does so by prohibiting, subject to certain qualifications, "customizing" textbooks and course materials by including "supplemental information, logos, design features, or any other information specific to the college, university, technical institute, geographic area, or state." Proposed A.C.A. § 6-60-601(a)(1)(A). The proposed legislation would bar the use of such information in required materials only if the information would produce "no substantive change to the main text" and if the professor attempted to require use of the "customized" material to the exclusion of alternative material "containing the main or substantially similar text." Proposed A.C.A. §§ 6-60-601(a)(1)(B) and-601(a)(1)(C). Subsection (c) of the proposed statute would further allow the exclusive use of "customized" material so long as various college officials approved of the use.
Notwithstanding the various proposed qualifications upon the prohibition summarized above, in my opinion, the qualified prohibition would nevertheless remain a legislative restriction based upon the subject matter of expression, raising the question of what standard of review would apply. As noted above, content-neutral restrictions upon private speech are clearly subject to an intermediate level of scrutiny. By contrast, restrictions on speech based on content are normally subject to strict judicial scrutiny. Under a strict scrutiny analysis, challenged legislation will be upheld only if it is narrowly tailored to serve a compelling state interest. U.S. Term Limits, Inc. v. Hill, 316 Ark. 251, 271, 872 S.W.2d 349 (1994). As the Court noted in PoliceDepartment of Chicago v. Mosley, *Page 21 408 U.S. 92, 95-96 (1972): "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content." The Court has since declared that "[c]ontent-based regulations are presumptively invalid."R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992).
Assuming a reviewing court were to apply a strict-scrutiny standard in reviewing SB 35, I question whether the legislation would pass constitutional muster. It seems doubtful that the government's interest in controlling costs to students by making available used textbooks would be sufficiently compelling to warrant restricting a university or its professors' autonomy in selecting instructional materials.[6]
However, determining the strength of the government's interest would obviously entail conducting a factual inquiry into what the actual cost benefits of imposing the restriction might be. Only a finder of fact would be situated to conduct such an inquiry.
Having addressed what would be the parameters of a strict-scrutiny analysis, I feel compelled to reiterate that a court might be disinclined to proceed with such a review based upon the principles set forth in Garcetti, supra. As noted above, the Supreme Court inGarcetti was somewhat coy in addressing how or if its ruling regarding a government employer's control over employee speech might apply within the context of academic speech. Compounding the difficulty in addressing this question is the related question of whether the legislature, as distinct from the university itself, might be deemed a public employer for purposes of applying Garcetti.
Finally, I should note that I consider SB25 vulnerable to constitutional attack based upon vagueness. A law is unconstitutionally vague if a reasonable person could not tell precisely what sorts of speech it restricts. See, e.g., Connally v. General Construction Co.,269 U.S. 385,391 (1926) (holding that a law is unconstitutionally vague if a person "of common intelligence must necessarily guess at its meaning");see also Erwin Chemerinsky, Constitutional Law: Principles andPolicies (1997) § 11.2.2. In my opinion, it is unclear what might *Page 22 
constitute a "substantive change to the main text," proposed A.C.A. § 6-60-601(a)(1)(B), and what range of information might be excluded by the proposed provision that would preclude a professor from assigning a recent edition of a text when the previous edition contains "the main or substantially similar text," proposed A.C.A. § 6-60-601(a)(1)(C). To my mind, the meaning of "substantive change" and "substantially similar" are unconstitutionally vague. I further believe that A.C.A. §6-60-601(a)(1)(A) might be deemed unconstitutionally vague in providing that a textbook could be considered "customized" if it "[i]ncludes supplemental information . . . specific to the . . . geographical area, or state." In my opinion, this language is unconstitutionally vague in that it precludes specific determinations regarding what information might fall within its scope, leaving it unclear what academic speech is permissible.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] As the United States Supreme Court has noted: "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us," Keyishian v. Board of Regents of theUniversity of the State of New York, 385 U.S. 589, 603 (1967), and is a "special concern of the First Amendment, United States v. AmericanLibrary Association, Inc., 539 U.S. 194, 226 (2003).
The term "academic freedom" is equivocal, encompassing both an educational institution's entitlement to pursue its ends without unreasonable government interference and an individual professor's entitlement to teach his courses without unreasonable institutional interference. See Piarowski v. Illinois Community College, 759 F.2d 625,629 (7th Cir. 1985) (citing Regents of the University of California v.Bakke, 438 U.S. 265, 312 (1978) as illustrating the former). Seealso Todd A. DeMitchell, Academic Freedom — Whose Rights: TheProfessor's or the University's?, 168 Ed. Law Rep. 1 (2002) (generally discussing this distinction). With respect to the concept of institutional academic freedom in choosing curricula, the Supreme Court has observed:
 Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also . . . on autonomous decisionmaking by the academy itself.
Regents of University of Michigan v. Ewing, 474 U.S. 214, 226 n. 12 (1985). This attitude is reflected in the following from the concurrence of Justice Souter, joined by Justices Stevens and Breyer, in Board ofRegents of the University of Wisconsin System v. Southworth,529 U.S. 217, 237 (2000):
 Our understanding of academic freedom has included not merely liberty from restraints on thought, expression, and association in the academy, but also the idea that universities and schools should have the freedom to make decisions about how and what to teach.
But see Richard H. Hiers, Institutional Academic Freedom — AConstitutional Misconception: Did Grutter v. Bollinger Perpetuate theConfusion?, 30 J.C. U.L. 531 (2004) (strenuously arguing that the concept of academic freedom as insulating universities from governmental control under the First Amendment is a misconception based upon various Supreme Court and lower court dicta).
[2] The Court has, in dictum, offered the following declaration:
 [T]he university is a traditional sphere of expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment.
Rust v. Sullivan, 500 U.S. 173, 200 (1991) (citing Keyishian v. Board ofRegents, 385 U.S. 589, 603 (1967). 
[3] The Court's failure precisely to define the scope of academic freedom and its relationship to standard First Amendment analysis has engendered considerable academic frustration, perhaps most vigorously expressed in Hiers, supra n. 1, who appears to consider the concept of academic freedom, particularly at the institutional level, purely a creature of dictum grounded not in the First Amendment but rather in judicially libertine social-policy judgments. I need not, and therefore will not, express any opinion on this issue other than to remark that the origin and scope of academic freedom is far from clearly defined.
[4] In this regard, I should note that in Epperson v. Arkansas,393 U.S. 97, 107 (1968), which both AAP and the Cooper court itself recite in support of the court's declaration, the Supreme Court observed:
 The State's undoubted right to prescribe the curriculum for its public schools does not carry with it the right to prohibit, on pain of criminal penalty, the teaching of a scientific theory or doctrine where that prohibition is based upon reasons that violate the First Amendment. It is much too late to argue that the State may impose upon the teachers in its schools any conditions that it chooses, however restrictive they may be of constitutional guarantees. Keyishian v. Board of Regents, 385 U.S. 589, 605-606 (1967).
(Emphasis added.) Although Epperson did not deal with higher education, this passage appears to acknowledge that a state may by statute impose certain restrictions on curriculum in public education generally.
[5] Padilla was decided on remand by the First Circuit Court of Appeals in Privada de Puerto Rico, Inc. v. Echeverria-Vargas,385 F.3d 81 (2004), in which the circuit court held that, in light of pending factual issues, the trial court had erred in dismissing as a matter of law a complaint challenging the constitutionality of legislation requiring private primary and secondary schools to make available for purchase the former edition of any textbook when the most recent edition did not contain significant changes. See Associacion de EducacionPrivada de Puerto Rico v. Echevarria-Vargas, 289 F. Supp. 2d 1 (D. Puerto Rico 2003).
[6] By way of illustration of possible content restrictions, proposed A.C.A. § 6-60-601(a)(1)(A) would preclude an institution or professor from assigning a standard undergraduate law text that includes supplementary case references to recent conforming Arkansas law. Assuming these references did not mark a "substantive" change to the text — a question that is subject to debate and hence might render the proposed statute void for vagueness, see discussion infra — they would be prohibited under the proposed legislation, thus rendering the legislation content-based.